OPINION
{¶ 1} Plaintiff-appellant Natalie Moore, by and through her mother Maureen Moore, appeals a judgment in which the Montgomery County Court of Common Pleas, General Division, sustained defendant-appellees Obstetrics Gynecology South, Inc. and Cathy E. *Page 2 
Liesner, M.D.'s motion for directed verdict with respect to the Moores' claim that Dr. Liesner was negligent for failing to offer the option of delivering Natalie by cesarian section (hereinafter "c-section").
 {¶ 2} Subsequently, the jury returned a verdict for the defense on the Moores' only remaining theory of liability, namely that Dr. Liesner was negligent for allegedly exerting excessive traction on Natalie's head during the delivery process. The Moores filed a timely notice of appeal on March 1, 2007.
 I {¶ 3} Natalie Moore was born on May 17, 2002. Prior to her birth, doctors from Obstetrics Gynecology South, Inc. had assisted in the deliveries of Maureen Moore's other two children. Her first child was a male born on June 21, 1994. His was a difficult delivery. The second child, a female, was delivered on January 7, 1996.
 {¶ 4} Before Natalie was delivered, physicians and staff at Obstetrics Gynecology South, Inc. began her prenatal care on October 19, 2001. Approximately two months later, an ultrasound was performed that gave Natalie an estimated due date of May 12, 2002. Additionally, the ultrasound results showed no abnormalities, and the months leading up to Natalie's birth were uneventful.
 {¶ 5} Testimony offered at trial established that on May 8, 2002, shortly after thirty-nine weeks into the pregnancy, Dr. Liesner advised Maureen that she was a candidate for inducement because tests indicated that Natalie was heavier than nine pounds. Dr. Liesner did not inform Maureen that a c-section was a delivery option nor did she recommend a c-section as means to deliver Natalie. Relying on Dr. Liesner's medical advice, Maureen and her husband *Page 3 
scheduled an appointment on May 17, 2002, for an induction procedure and delivery by labor.
 {¶ 6} As scheduled, Maureen's labor was induced. Labor proceeded normally until Natalie's head crowned, and she stopped descending through the birth canal. After a quick evaluation, Dr. Liesner determined that Natalie's anterior shoulder blade was stuck under Maureen's pelvis. This is a relatively rare condition that occurs during a small number of deliveries called shoulder dystopia.
 {¶ 7} Dr. Liesner then employed a variety of techniques and maneuvers in an effort to free Natalie's shoulder. Eventually, Dr. Liesner was able to rotate Natalie in such a way so that her shoulder could be freed, and the delivery was completed. Some time after the delivery, Natalie's father, Craig Moore, noticed that she was not moving her right arm at all while she seemed to have mobility in the rest of her body. Craig confronted Dr. Liesner regarding his observation, and she allegedly stated that it is a relatively common occurrence for a larger baby's clavicle to be broken during delivery. She also reassured him that x-rays would be performed in order to determine the nature of Natalie's injury. The x-rays were performed, but Natalie's collar bone was not broken. It was later determined that, in fact, Natalie suffered from Erb's Palsy, which is a birth related injury where the bundle of nerves (the brachial plexus) that runs from the neck to the upper part of the arm is stretched or torn during the delivery process.
 {¶ 8} At trial, Dr. Liesner testified that the trauma to Natalie's brachial plexus occurred when her shoulder became lodged under Maureen's pelvis during delivery. Maureen's pushing, in turn, caused the uterus to compress, whereby Natalie's head was moved and her brachial plexus was stretched to breaking. As a result of her condition, Natalie's right shoulder is raised, *Page 4 
and her shoulder blade protrudes. Natalie's right shoulder and arm muscles are also small, and will never develop properly. Dr. John Conomy, appellant's neurology expert, testified that Natalie's condition is both permanent and severe.
 {¶ 9} The Moores' expert, Dr. Paul Gatewood, M.D., testified that Dr. Liesner's failure to offer Maureen Moore a c-section delivery fell below the accepted standard of care and that had Natalie been delivered by c-section, more likely than not she would have been born normal, and not encountered the shoulder dystocia which resulted in Erb's palsy when her bracheal plexus was stretched or torn during the vaginal delivery. Maureen Moore said she would have opted for a c-section had Dr. Liesner offered her the procedure.
 {¶ 10} As previously stated, the Moores advanced two theories of culpability with respect to the standard of care required of Dr. Liesner. First and foremost, appellants argued that the injury was caused when Dr. Liesner pulled too hard on Natalie's head when attempting to deliver the child after determining that a shoulder dystopia event was occurring. Appellants also attempted to argue that Dr. Liesner was negligent in failing to offer Maureen Moore the option of a c-section rather than simply recommending a trial by labor or vaginal delivery. Prior to trial, the court advised appellants that to prove medical malpractice, they would be required to prove thatfailing to perform the c-section fell below the standard of care, in addition to simply failing to offer the procedure.
 {¶ 11} Immediately prior to closing arguments, appellees moved for directed verdict, claiming that appellants had failed to adduce any evidence which demonstrated that Dr. Liesner's actions fell below the standard of care when she failed to perform a c-section in lieu of a vaginal delivery. In fact, the Moores' expert, Dr. Paul Gatewood, M.D., testified that based on *Page 5 
all of the same information available to Dr. Liesner at the time of Natalie's delivery, he would have also performed a vaginal delivery, and not a c-section. The trial court held that simply failing to offer a c-section to Maureen Moore did not constitute medical malpractice. Thus, the motion for directed verdict was sustained, and the jury was allowed to consider evidence on the Moores' only remaining theory of liability, namely that Dr. Liesner was negligent for allegedly exerting excessive traction on her head during the delivery process. The jury, as mentioned above, returned a verdict in favor Dr. Liesner.
 II {¶ 12} The Moores' sole assignment of error is as follows:
 {¶ 13} "THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR DIRECTED VERDICT."
 {¶ 14} In their sole assignment, the Moores contend that the trial court erred when it directed a verdict in favor of appellees regarding whether Dr. Liesner was negligent for having failed to offer a c-section in order to deliver Natalie. The Moores argue that the testimony adduced at trial clearly established that Dr. Liesner deviated from the required standard of care when she failed to offer the option of a c-section to Maureen Moore. The Moores argue that this failure proximately caused the injuries from which Natalie now suffers. Lastly, the Moores assert that they met the required burden of proof, through the necessary expert testimony, in order to establish medical negligence on the part of Dr. Liesner and her staff.
 {¶ 15} Civ. R. 50(A)(4) addresses motion for directed verdict when granted on the evidence or lack thereof. The Rule states in pertinent part:
 {¶ 16} "When a motion for directed verdict has been properly made, and the trial court, *Page 6 
after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 17} The "reasonable minds" test calls upon a court to determine only whether there exists any evidence of substantial probative value in support of the claims of the non-moving party. Wagner v. RocheLaboratories (1996), 77 Ohio St.3d 116, 119-120, 671 N.E.2d 252,1996-Ohio-85. In Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66,430 N.E.2d 935, the Supreme Court of Ohio discussed the following analysis a trial court is to adhere to when ruling on a motion for directed verdict:
 {¶ 18} "When a motion for directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to jury. This does not involve weighing the evidence or trying the credibility of the witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove. The `reasonable minds' test * * * calls upon the court only to determine whether there exists any evidence of substantial probative value in support of that party's claims. SeeHamden Lodge v. Ohio Fuel Gas Co. (1934), 127 Ohio St. 469,189 N.E. 246. Weighing evidence connotes finding facts from the evidence submitted; no such role is undertaken by the court in considering a motion for a directed verdict. A motion for directed verdict raises a question of law because it *Page 7 
examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence. To hold that in considering a motion for directed verdict a court may weigh the evidence, would be to hold that a judge may usurp the function of the jury. Section 5, Article I of the Ohio Constitution." Id. at 68-69, 430 N.E.2d 935.
 {¶ 19} An appellate court reviews a trial court's ruling on a motion for directed verdict de novo, as it presents said court with a question of law. Schafer v. RM.S. Realty (2000), 138 Ohio App.3d 244, 257,741 N.E.2d 155. "De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial."Dupler v. Mansfield Journal Co., Inc. (1980), 64 Ohio St.2d 116,119-120, 413 N.E.2d 1187. Thus, the trial court's decision is not granted any deference by the reviewing court. Brown v. Scioto Cty. Bd.of Commissioners (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.
 {¶ 20} As noted by the Ohio Supreme Court in Bruni v. Tatsumi (1976),46 Ohio St.2d 127, 131, 346 N.E.2d 673, the burden of proof borne by the plaintiff in a malpractice case requires two evidentiary steps: 1) "evidence as to the recognized standard of the medical community in the particular kind of case;" and 2) "a showing that the physician in question negligently departed from this standard in his treatment of the plaintiff." See Davis v. Virginian Ry. Co. (1960), 361 U.S. 354, 357, 80 S.Ct. 387.
 {¶ 21} "In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some *Page 8 
particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." Bruni,46 Ohio St.2d at 131, 346 N.E.2d 673.
 {¶ 22} As mentioned above, the trial court concluded that the appellants could not argue in one instance that Dr. Liesner was negligent in failing to offer the option of a c-section, but also acknowledge in the same breath that she was not negligent for failing to actually perform a c-section. We disagree with the reasoning of the trial court.
 {¶ 23} Dr. Gatewood testified that Dr. Liesner's failure to offer Maureen Moore a c-section delivery fell below the accepted standard of care and that had Natalie been delivered by c-section, more likely than not she would have been born normal, and not encountered the shoulder dystocia which resulted in Erb's palsy when her bracheal plexus was stretched or torn during the vaginal delivery. Maureen Moore said she would have opted for a c-section had Dr. Liesner offered her the procedure.
 {¶ 24} Thus, we do not agree with the trial court's reasoning that if Dr. Liesner was not negligent in failing to actually perform a c-section, she perforce could not be negligent in failing to offer Maureen Moore a c-section. The fact that Dr. Liesner may have reasonably concluded that vaginal delivery was appropriate does not necessarily excuse her failure to offer Maureen Moore a c-section where it was known that Natalie was a large gestational age (LGA) baby and Mrs. Moore had experienced a difficult first delivery.
 {¶ 25} It may well be that Dr. Gatewood's opinion was undermined by his testimony that a c-section was not required under the circumstances. However, this testimony went only to *Page 9 
the weight to be accorded his opinion testimony that Dr. Liesner was negligent in failing to offer Maureen Moore a c-section, the consideration of which was for the jury.
 {¶ 26} Although Dr. Liesner may have acted reasonably in proceeding with a vaginal delivery, Natalie was damaged in the process. A c-section would probably have prevented this damage. The jury should have been allowed to consider whether Dr. Liesner was negligent in failing to offer Maureen Moore a c-section.
 {¶ 27} The assignment of error is sustained. The judgment of the trial court is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.
FAIN, J., concurs.